Jo Ann PLAKAS, Individually and as Administrator of the Estate of Konstantino N. Plakas, Deceased, Plaintiff–Appellant,

v.

Jeffrey DRINSKI, in both his individual and official capacity and Newton County, Indiana, a municipal unit of government, Defendants–Appellees.

No. 93–1431.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1993.

Decided March 21, 1994.

Paul F. Michel (argued), Thomas McClure, Rosa A. Eliades, Elliott & McClure, Bourbonnais, IL, for Jo Ann PLAKAS.

Elizabeth A. Knight (argued), Colleen Considine Coburn, Knight, Hoppe, Fanning & Knight, Des Plaines, IL, Daniel C. Blaney, Blaney, Casey & Walton, Morocco, IN, Janella L. Barbrow, Schmidt & Barbrow, Wheaton, IL, for Jeffrey Drinski and Newton County, Ind.

Before CUMMINGS and COFFEY, Circuit Judges, and ZAGEL, District Judge.*

ZAGEL, District Judge.

Konstantino Plakas was shot once and killed by Jeffrey Drinski, a deputy sheriff. The only witnesses to the shooting were three police officers, Drinski and two others. All of the witnesses testified to an act of self-defense; that Plakas was moving toward Drinski and menacing him with a fireplace poker and that, moments before, Plakas had said to Drinski, "Either you're going to die here or I'm going to die here." Plakas's administrator claimed that the self-defense story was full of holes and that, even if it were not, Drinski and the county which employed him had a constitutional obligation to do more to preserve his life than they did. The district judge disagreed and granted summary judgment, 811 F.Supp. 1356. This appeal followed.

The details matter here, so we recite them.

When the police first saw Plakas, at about 9:30 p.m. on February 2, 1991, he was walking along State Road 10 in Newton County, Indiana, not far from the Illinois state line. His car had run off the road and wound up in a deep water-filled ditch. Sergeant Buddy R. King, of the Newton County Sheriff's Department thought the car had rolled over on its top and slid for 150 to 200 feet before rolling upright, striking a tree and coming to rest in the ditch. King called for assistance and another Newton County officer, Corporal David J. Koby, and two paramedics, Glen Cain and Steven Whitt, responded. On the way to the scene of the accident, Cain noticed

Plakas walking along State Road 10. Cain approached Plakas and saw that Plakas's clothing was wet from the waist down. Cain stopped and spoke to Plakas who said he was fine except that he was cold. Cain examined Plakas's head and found nothing that required medical treatment. Plakas told Cain he had been the driver of the car in the ditch, and Plakas agreed to get into Cain's car in order to be driven back to the accident scene, now about a mile from where Plakas was found. Cain knew there was an ambulance at that site and that Plakas could be examined more carefully there. Cain smelled alcohol on Plakas's breath and Plakas dozed off as they rode to the place where the car had gone off the road.

When Cain and Plakas arrived, the ambulance driver examined Plakas. Cain told Corporal Koby to check Plakas for intoxication and he told Koby why. Plakas refused medical treatment and signed a written waiver of treatment. Koby spoke to Plakas who had some difficulty communicating the fact that he did not have his driver's license (which he had surrendered as bond for a traffic ticket he received in Illinois). Plakas did agree to go to the Sheriff's Department to be tested for intoxication. Koby frisked Plakas and then handcuffed him, with his hands behind his back.

Plakas complained about being cuffed behind his back. He told Koby that this hurt him because he had burn scars on his chest and thought that if he got in the car, his chest would start to bleed. Koby told Plakas that this manner of cuffing was department policy which he must follow. Koby also thought that he would have a problem with Plakas if he uncuffed him. Koby opened the rear door of his squad car, and Plakas entered the car voluntarily. In Koby's car, the rear door handles are not removed. After a brief interval, Koby got in the car and drove away. As he drove he heard a noise that suggested the rear door was opened. He hit the brakes and heard Plakas hit the screen between the front and rear seats. Then the

* The Honorable James B. Zagel, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

rear door flew open, and Plakas fled into snow-covered woods.

Koby reported the escape and called for help. King, Koby, Cain and Trooper Lucien Mark Perras of the Indiana State Police responded, as did Deputy Sheriff Jeffrey Drinski.

Plakas ran to the Ailes home located on a private road north of State Road 10. He knew the Aileses, Roy and Joyce; he was engaged to marry their daughter, Rachel. They called Plakas "Dino." Joyce Ailes heard Dino banging against the house; she saw him and opened the door. He fell on his face inside the doorway, his hands still cuffed behind his back. Joyce and Rachel helped him. They noticed that his clothes were wet. Plakas told them that he had wrecked his car and that his head hurt. Joyce saw no blood, but saw bumps on his head and bruises. He appeared to be blacking out.

Roy Ailes spoke to Plakas, smelled alcohol on his breath, and found him to be upset and insistent that he did nothing wrong. Roy told him that he should not run from the police. Plakas agreed that Roy should talk to the police. Roy went out and found Cain, whom he knew, and reported that Plakas was at the Ailes home and willing to come out. Cain and some officers went to the house. Roy stayed outside to direct other police to his house.

Cain and Koby were the first to enter. Cain saw Plakas push his legs through the circle of his arms, bringing his cuffed hands to the front of his body. Plakas was calm until he saw Cain and Koby. While Cain and the others tried to explain that Cain was from the fire department and wanted only to give medical aid, Plakas was loud and combative; (Joyce Ailes said he was "hysterical"). Plakas accused Koby of hurting him, and yelled about the handcuffing behind his back and about his scar tissue. He swore Koby would not touch him. Koby sought to reassure Plakas that he was not there to hurt him. Koby gestured for Cain to back up.

Plakas backed into a corner and neared a set of fireplace tools. He picked one of them up, a 2–3 foot poker with a hook on its end. Then gripping it with both hands, he continued screaming, louder and louder at Cain and Koby. Finally he rushed at Koby and swung quite hard at Koby, striking Koby's wrist with the poker. Koby moved away and tried to come in the room from another door, but Plakas chased him away, swinging the poker. Deputy Drinski passed by the injured Koby and asked him with what he was hit; Koby told him that Plakas had a poker. Inside the house, Plakas took the poker, slammed it into the wall[1] and then beat his head against the wall. Cain left.

Having driven Koby and Cain from the house, Plakas walked out of the front door. Drinski and Perras had entered the house from the garage and saw Plakas leave. They followed him out, now with guns drawn. Roy Ailes, who had just returned to his house, saw the officers with guns drawn and ran forward saying, "Don't shoot, I'll talk to him." Roy tried to talk Plakas into surrendering. As he did so, Plakas slowly backed down a hill in the yard. The officers told Plakas to drop the poker. At one point, Plakas lowered the poker but did not lay it down. He raised or cocked the poker but did not swing it. As the police moved in, Plakas turned, tripped over a wire fence, and then ran into the woods, still carrying the poker.

The police gave chase, shouting, "Stop, Police." The moon was bright, light was reflecting off the snow and it was easy to track Plakas who slowed as he entered a row of thick brush hedges. Through an opening in the brush was a clearing. Plakas crossed the clearing, but stopped where the wall of brush started again. Perras and Drinski entered the clearing. Sergeant King stood just outside it. Plakas turned and faced them. The clearing was small, but Plakas and the officers were ten feet apart. Drinski blocked the opening in the brush where all had entered the clearing.

---

1. We adopt the version most favorable to plaintiff. Cain said that Plakas was not slamming the poker into the wall, rather, he was starting toward Cain and perhaps swinging it at Cain and missing. Cain thought Plakas was out to kill him.

For the next quarter-hour or half-hour, Drinski and Perras tried to talk Plakas into surrendering. At times Plakas moved the poker about; at times it rested against the ground. Drinski did most of the talking. His theme was that there were people, including his girlfriend at the house, who cared about Plakas and that nobody needs to get hurt. He also told Plakas to drop the weapon and get down on the ground. They talked about the handcuffs and the chest scars. Plakas opened his shirt to show the scars to Drinski. King, listening from outside the clearing, thought Drinski might persuade Plakas to drop the weapon, but he did not. Drinski did not believe that Plakas was ever ready to surrender, although he was calmer for a time.

At one point Plakas pointed the poker at Drinski and said, "Either you're going to die here or I'm going to die here." He also said, in substance, "Go ahead and shoot. My life isn't worth anything." Plakas often repeated these thoughts. Then Plakas tried to break through the brush. He turned back to Drinski who was 12 to 15 feet away and, with the poker raised, charged at Drinski who backed away. Drinski's retreat was involuntarily stopped, either by his backing into a tree or by a near stumble of some sort. Drinski believed he couldn't retreat because there was something behind him. He saw Plakas cock the poker over his head for a swing and, when Plakas was two arms lengths away, he fired once at Plakas' chest. The shot hit Plakas in the chest inflicting a mortal wound. After he was shot, Plakas fell to Drinski's right and lay face down semiconscious on the ground. Perras took the poker. Plakas was turned on his back. The handcuffs were removed. Plakas remained semiconscious until medical assistance arrived. He moaned and said, "I'm dying." Since medical assistance previously had been requested for Koby, it was not long in coming. When paramedic Whitt arrived at the clearing, he found Plakas laying about a foot from the brush at one corner of the clearing. Plakas

died sometime after he arrived at the hospital.

Drinski was in fear of his life, and Plakas's action was sudden and unexpected. Perras would have shot Plakas if Drinski had not. During the entire time in the clearing, Perras had a canister of CS repellant on his belt.[2] It could have been used to disable Plakas. Moreover, about ten minutes before the shooting, the services of a canine unit (from Lake County) were offered. The police could have tried to put barriers between themselves and Plakas and maintain distance from him.

■ This is not a case where an officer claims to have used deadly force to prevent an escape. It is a self-defense case where the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer" and, therefore, the officer may use deadly force. *Tennessee v. Garner*, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985). *See also Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Indeed, had Drinski been a private citizen, he would have been entitled to claim self-defense under Indiana law (which does not have a rule of retreat). *French v. State*, 273 Ind. 251, 403 N.E.2d 821, 823, 825 (1980); *Montague v. State*, 266 Ind. 51, 360 N.E.2d 181, 188–89 (1977).

Drinski was faced with a man who had, minutes before, attacked a police officer with a dangerous weapon, had refused several entreaties to disarm, had told the officer that one of the two would die that night, and then had moved toward the officer while raising his weapon to strike. Shooting a man who has told you, in effect, that he is going to use deadly force against you and then moves toward you as if to do so is unquestionably an act of self-defense even if, as Plakas's expert maintains, the man is attempting "suicide by police."

Plakas argues there is enough evidence to cast doubt on the defendants' self-defense claim, given the low threshold that courts

---

**2.** Perras said that he did not use the CS repellant because he was too far from Plakas and because it might have landed on his fellow officers. Whatever the facts may be, it is hard to attribute

to either Drinski or Newton County the inaction of Perras, who is neither a defendant here nor under the command of Newton County.

have set for refuting self-defense in deadly force cases both civil and criminal. The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial.

This guiding principle does not fit well here. There is a witness who corroborates the defendant officer's version. And there is no reason to discount the testimony of Trooper Perras; he is neither a defendant himself nor employed by the defendant Newton County. Even if there were no other witness, there is virtually nothing in this record to impeach Drinski. Plakas brings up a few bits of evidence to do so. First, according to Drinski, Plakas charged away from the brush at Drinski, yet one paramedic who was summoned to the clearing to administer to Plakas observed that Plakas's feet were about a foot from the brush. This does not help Plakas's case because, by the time the paramedic arrived, Plakas's body had been moved, rolled over by Drinski and Perras.[3] Plakas himself may have also moved; the dying man kicked over the paramedic's medical case.

Second, Drinski said he was stopped in his retreat by a tree. Perras only saw that Drinski stumbled in his retreat either because he backed into something or simply tripped. The fact remains that both officers say that Drinski's retreat occurred and that it ended by virtue of some circumstance other than Drinski's volition. Further, says Plakas, a photograph of the clearing shows there was no tree there to stop Drinski, just a

sapling, and there are no footprints corroborating Drinski's story of retreat. Actually, the photograph is not included in the record here. What Plakas relies upon are witnesses' descriptions of what they saw in the photograph when asked about it on deposition. There is no showing that any footprints could be clearly discerned in the photograph. In any event, Drinski did not say he was stopped by running into a tree, he said it felt as though he ran into a tree and there is nothing in the record to contradict this testimony other than counsel's speculation that an officer who backs into a sapling would not reasonably believe a tree was at his back. The tree-sapling discrepancy is of the sort on which popular conspiracy theories are built, but it is not enough to allow a rational trier of fact to decide against Drinski. *See Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 456 (7th Cir.1991); *Tom v. Voida,* 963 F.2d 952, 961 (7th Cir. 1992).

◼ Perhaps in recognition of this weakness in the case, Plakas offers two other theories, one of which is a minor theme of his brief, that shooting in self-defense is unjustified where the aggressor acted out of reasonable fear of police brutality. *See Gilmere v. City of Atlanta,* 774 F.2d 1495, 1501 (11th Cir.1985) (*en banc*). Perhaps we ought not to consider this theory since it was not pled, but it is of no use to Plakas in any event.

This theory is founded on the fact that Plakas told Koby, "You hurt me," and on Joyce Ailes's observation that Plakas had facial injuries. From this, Plakas argues a jury could infer that Officer Koby had beaten Plakas. This inference, however, cannot reasonably be made. Leaving aside the absence of evidence of facial injuries from medical records or post-mortem observation, we accept that Mrs. Ailes saw these injuries. But when she did so, Plakas had already been in

---

**3.** The record before us leaves only room for speculation about some circumstances. We do not know whether there was any forensic investigation made at the scene. We know the caliber of the bullet, but not its type or weight or the power of the charge in the cartridge, nor do we know where it struck Plakas and what effect it might have on the position of the body. *See* Martin L. Fackler, M.D., *Police Handgun Ammu-*

*nition Selection,* Wound Ballistics Review, Fall 1992, at 32–37 (suggesting little effect beyond stopping movement). Because these facts are not in the record, we cannot consider them on appeal and assume that had they any significance, they would have been made part of the record. Circuit Rule 28(d); *Branion v. Gramly,* 855 F.2d 1256, 1260–61 (7th Cir.1988).

one car accident, had cracked his head against the front seat shield in Koby's. car, had run a considerable distance through forest and open terrain with his hands cuffed behind his back and, finally, when he entered the Ailes home, he did so by falling face down on the floor. Moreover, when Plakas did say anything at all about Koby, it was a complaint about cuffing him behind his back, which he said (without medical corroboration even now) caused pain because of his scar tissue. Plakas yelled a lot at Koby. It is significant he never yelled about a beating.

■ Even if Koby did beat Plakas, Koby was not at the scene of Plakas's demise. The officers who confronted Plakas were not the officers who injured him and should be able to claim self-defense. The proposition that an officer who beats John Doe may not use self-defense to justify killing Doe, who later attacks him, rests on the idea that because the officer's wrongful acts caused the attack, he cannot take advantage of his fear of retaliation to defend against liability. *See Gilmere,* 774 F.2d at 1501 ("any fear on the officer's part was the fear of retaliation against his own unjustified physical abuse").[4] Drinski did not cause Plakas to attack him. He can claim self-defense to shooting Plakas.

■ Finally, there is the argument most strongly urged by Plakas. Even if Plakas attacked Drinski and Drinski acted in self-defense, Plakas was still wronged because Drinski had a duty to use alternative methods short of deadly force to resolve the situation before him. Taken literally the argument fails because Drinski did use alternative methods. He tried for quite a while to get Plakas to lay down the poker and surrender and even attempted to retreat as Plakas charged him. Plakas means to argue that Drinski should have used *all* available alternatives before deadly force was exercised and that Newton County, Drinski's employer, is liable because it failed to equip and train Drinski to use such methods.

The alternatives here were three. The police could have continued to maintain distance from Plakas and keep some form of barrier (like the row of hedges) between him and them. They could have used disabling chemical spray, or they could have used a dog to disarm Plakas. It is unusual to hear a lawyer argue that the police ought to have caused a dog to attack his client, but he is right that such an attack *might* have led to a better result for his client (and would, in our view, have led to a different sort of lawsuit). Plakas also correctly refrains from arguing that the police should have simply walked away and arrested Plakas on another day.

There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.[5] There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first. In *Ford v. Childers,* 855 F.2d 1271 (7th Cir.1988) (*en banc*), police officers shot and wounded a masked bank robber fleeing from the scene of his crime. Twice the police called out, "Halt, police," but the plaintiff may not have heard. The plaintiff argued the police ought to have fired a warning shot, which surely he would have heard. We said, "[T]he officers' split second decision to use their weapons, after twice warning the suspect, was objectively reasonable under the circumstances. We refuse to impose as an additional constitutional requirement the firing of a warning shot before deadly force may be used." *Id.* at 1276, n. 8. Also, in *Carter v. Buscher,* 973 F.2d 1328 (7th Cir.1992), it was claimed that the police had so poorly planned an arrest that the chance of a deadly gunfight was increased rather than minimized. An alternative plan could have reduced or eliminated the possibility of the arrestee's use of a gun. In *Carter,* such an alternative was not merely speculative; the arrestee was employed inside a prison where he would not have had a gun on his person. Yet we rejected the proposition

---

4. Here we distinguish *Gilmere,* but by doing so we neither approve nor disapprove of its holding.

5. There may be state law rules which require retreat, but these do not impose constitutional duties. *See Reed v. Hoy,* 909 F.2d 324, 330–31 (9th Cir.1989).

"that the Fourth Amendment prohibits creating unreasonably dangerous circumstances in which to effect a legal arrest of a suspect." *Id.* at 1332. These cases make it clear that liability cannot be founded on the failure of Drinski to keep some sort of distance or natural barrier between himself and Plakas.

The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable. *Illinois v. Lafayette,* 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); *United States v. Martinez–Fuerte,* 428 U.S. 543, 556–57 n. 12, 96 S.Ct. 3074, 3082 n. 12, 49 L.Ed.2d 1116 (1976). We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Garner v. Tennessee* and *Graham v. Connor, supra.*

But Plakas does have at least one opinion on which he may build his argument, that is, *Tom v. Voida,* 963 F.2d 952 (7th Cir.1992), a case of tragic dimension where an officer stopped to help a fallen man and eventually, as two courts held, had to kill that man in defense of her own life. In brief, after the officer stopped to help the man, his actions and his flight showed he was unhurt and may well have stolen the bike from which he fell. She chased him and, when she caught him, he attacked her, banging her head into a concrete surface. He fled but she caught him. Again, he struck her. It became clear she could not physically subdue him. She did not have her night stick. She had no idea if other officers would arrive. She decided she would have to pull her weapon so that he would not get it. After the weapon was out, she told him three times, "Please don't make me shoot you." He moved toward her. She fired and missed. He stopped, then lunged again; she fired into his chest. In affirming summary judgment for the officer, we said,

> Voida could not have subdued Tom through lesser means, as she did not have her nightstick with her and she feared that reaching for her chemical repellant would expose her weapon to Tom's grasp. Voida fired one shot at Tom which did not hit him, but he insisted on lunging at her again. Voida was justified in concluding that Tom could not have been subdued except through gunfire.

*Id.* at 962.

It is obvious that we said Voida thought she had no alternatives. But did we hold that this imposes a constitutional duty to use (or at least consider) the use of all alternatives?

The answer is no. *Tom v. Voida* did not, and did not mean to, announce a new doctrine. Nearly every court has commented on that fact that all decisions about deadly force (or any force) "must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain and rapidly evolving." *Graham,* 490 U.S. at 396–97, 109 S.Ct. at 1872; *see also Sherrod v. Berry,* 856 F.2d 802, 806–07 (7th Cir.1988) (*en banc*). We always judge a decision made, as Drinski's was, in an instant or two. It is true we consider the whole of the event as it appears to the officer involved, but we recognize that the decision to shoot can only be made after the briefest reflection, so brief that "reflection" is the wrong word. As Plakas moved toward Drinski, was he supposed to think of an attack dog, of Perras's CS gas, of how fast he could run backwards? Our answer is, and has been no, because there is too little time for the officer to do so and too much opportunity to second-guess that officer.

In *Tom v. Voida* we were not addressing Officer Voida's decision to shoot; we were addressing her decision to draw her firearm and, even there, we spoke of a decision process that was quick and simple. Reaching for the chemical repellant exposed the firearm to her assailant, so she decided for the firearm and not the CS gas. This is not the kind of weighing of least deadly alternatives that Plakas would have us require of Drinski. What Drinski did here is no different than what Voida did. He tried to avoid violence. Then, when he thought his retreat would not be successful, he was justified in concluding that Plakas could not be subdued at that moment except through gunfire.

Our historical emphasis on the shortness of the legally relevant time period is not accidental. The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

So we carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage. *Tom v. Voida* is a classic example of this analysis. Here it is beyond dispute that, under the Constitution, the police could reasonably (1) arrest Plakas for drunk driving after he exhibited familiar signs of intoxication; (2) track down an escaping arrestee; (3) draw and point weapons after Plakas armed himself and attacked an officer; (4) pursue Plakas into the clearing after he committed a violent offense and was a danger to himself; and (5) try to talk Plakas into disarming himself and surrendering. All of this means Drinski was properly standing in the clearing, gun in hand, several feet away from Plakas, who charged him with the poker raised. It is from that point on that we judge the reasonableness of the use of deadly force in light of all that the officer knew. We do not return to the prior segments of the event and, in light of hindsight, reconsider whether the prior police decisions were correct. Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer. Here we agree that the undisputed facts can lead to but one conclusion, that Drinski's use

of deadly force was reasonable given Plakas's act of aggression and Drinski's knowledge of what had gone on before.

■ Since Drinski did not violate Plakas's rights, there usually is no basis for holding his employer, Newton County, liable. *Tom,* 963 F.2d at 962. Yet there exists a possibility that although Drinski's acts were justified given his circumstances, Newton County may be held liable for creating those circumstances. Plakas implicitly argues that although Drinski's choice among available alternatives was reasonable, he should have had more choices, *i.e.,* a trained canine, a canister of gas.[6] Plakas implicitly seeks to hold Newton County liable for not providing those choices.

There is, however, not a single precedent which holds that a governmental unit has a constitutional duty to supply particular forms of equipment to police officers. And, in fact, the Fifth Circuit has held that the Constitution "does not mandate that law enforcement agencies maintain equipment useful in all foreseeable situations." *Salas v. Carpenter,* 980 F.2d 299, 310 (5th Cir.1992). Indeed, Plakas merely states this theory, he does not argue it. Nor does he show how such a rule of liability could be applied with reasonable limits. We do not think it is wise policy to permit every jury in these cases to hear expert testimony that an arrestee would have been uninjured if only the police had been able to use disabling gas or a capture net or a taser (or even a larger number of police officers) and then decide that a municipality is liable because it failed to buy this equipment (or increase its police force). There can be reasonable debates about whether the Constitution also enacts a code of criminal procedure, but we think it is clear that the Constitution does not enact a police administrator's equipment list.[7] We decline to use

---

6. There are a wide variety of devices available for non-lethal control of those who refuse to surrender, including tasers, capture nets, sticky foam, rubber bullets, and beanbag projectiles. *See, e.g.,* John Barry & Tom Morganthau, *Soon, 'Phasers on Stun',* NEWSWEEK, Feb. 7, 1994, at 24–26. None of these devices is unfailingly effective and safe, and courts and juries are unlikely to be capable of judging when they ought to be used.

7. The closest thing we have to such a list is the rule which requires prison administrators to provide a law library to inmates, but even here we only require this as an alternative to providing other forms of legal assistance. And, of course, judges are far more competent to say what equipment is needed to prepare a lawsuit than they are to say what equipment is best to defend

this case to impose constitutional equipment requirements on the police.[8]

The district court's grant of summary judgment is AFFIRMED.

one's self against an attack by a man with a poker.

8. Likewise, we decline to impose a constitutional requirement to train the police to use all available equipment beyond the acceptable training program already mandated. In this record, there is expert opinion that Drinski might have been better trained to negotiate with Plakas and that he may have said one thing to Plakas that he ought not to have said, *i.e.*, that Plakas could hit Drinski with the poker as long as it was not in the head. Plakas, however, merely mentions this testimony to show that Drinski was badly trained. There is no contention that this "invitation" immediately preceded the shooting or caused Plakas to charge Drinski. The only argument in this case is that Plakas did not charge at all.