The ESTATE OF Robert J. FORTUNATO, by his personal representative Paul J. Fortunato, Plaintiff,

v.

Michael HANDLER, both individually and as District Attorney for the County of Indiana, Chester Maholtz, both individually and as Team Leader of the Pennsylvania State Police S.E.R.T., George March, both individually and as Director of the State Police Bureau of Emergency and Special Operations, Robert Fyock, both individually and as Chief County Detective for the Borough of Indiana, Eugene King, James Martsolf, and Dale Smith, Members of the Pennsylvania State Police Sudden Emergency Response Team, Defendants.

Civil Action No. 94–2221.

United States District Court, W.D. Pennsylvania.

Aug. 21, 1996.

Timothy Paul Dawson, Adamsburg, PA, for Estate of Robert J. Fortunato.

Marie Milie Jones, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for Michael Handler, Robert Fyock.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court are summary judgment motions filed on behalf of (i) defendants Michael Handler, District Attorney of Indiana County and Robert Fyock, Chief County Detective of Indiana County ("county defendants") (Document No.66), and (ii) defendants George March, Director of the State Police Bureau of Emergency and Special Operations, Chester Maholtz, Team Leader of the Pennsylvania State Police Sudden Emergency Response Team ("S.E.R.T."), and State Police Troopers Eugene King, James Martsolf and Dale Smith ("state police defendants") (Document No. 71). Upon consideration of defendants' motions for summary judgment, memoranda in support and statements of undisputed facts with affidavits, supporting deposition transcripts and other documentary material attached, and the plaintiff's response, statement of material facts with attachments, affidavit and memorandum opposing summary judgment, the Court will grant summary judgment in favor of defendants on the basis of qualified immunity.

### I. Summary Judgment Standards

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language ... mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must view the facts in a light most favorable to the non-moving party and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Id.,* 477 U.S. at 242, 106 S.Ct. at 2505–2507. The "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against the moving party.'" *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62, 66 (3d Cir.1978), quoting *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. Hollingsworth Corp.,* 996 F.2d 632 (3d Cir.1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224 (3d Cir.1993).

When the non–moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non–moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. If the moving party has carried this burden, the burden shifts to the non–moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Petruzzi's IGA Supermarkets,* 998 F.2d at 1230. When the non–moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

## II. Statute of Limitations

■ Defendants initially assert that plaintiff's claim is time–barred. Federal courts apply the analogous state personal injury statute of limitations in section 1983 actions. *Smith v. Holtz,* 856 F.Supp. 227, 231 (M.D.Pa.1994), *citing Wilson v. Garcia,* 471 U.S. 261, 276–80, 105 S.Ct. 1938, 1947–49, 85 L.Ed.2d 254 (1985). Thus Pennsylvania's two–year personal injury statute of limitations, 42 Pa.C.S.A. § 5524, applies. *Urrutia v. Harrisburg County Police Dep't,* 91 F.3d 451, 457 n. 9 (3d Cir.1996).

Robert J. Fortunato ("Fortunato" or "decedent") was shot and killed by members of the Pennsylvania State Police Sudden Emergency Response Team ("S.E.R.T.") on December 31, 1992, during the execution of a warrant for his arrest on misdemeanor charges of harassment by communication and making terroristic threats in violation of sections 5504(a)(1)(2) and 2706 respectively, of the Pennsylvania Crimes Code, 18 Pa.C.S. §§ 5504(a)(1)(2), 2706. Decedent's twin brother, Paul J. Fortunato ("Paul Fortunato" or "Administrator"), filed a complaint on behalf of the Estate of Robert J. Fortunato, as "personal representative," on December 30, 1994, one day before the two–year statute of limitations was due to expire.

Defendants contend, however, that because Paul Fortunato did not apply for or receive letters of administration of the estate before the statute of limitations had run, the complaint filed before that time did not satisfy the statute of limitations, under Pennsylvania law, and his subsequent appointment as administrator does not "relate back." Defen-

dants' reliance on Pennsylvania case law is misguided, however, because federal procedural law, specifically Federal Rule of Civil Procedure 17(a), governs the relation back issue in this case.

Paul Fortunato applied for letters of administration on December 28, 1994, which were not granted by the Indiana County Register of Wills until February 7, 1995, because of the necessity of securing renunciations from other family members. Additionally, Paul Fortunato asserts in his Affidavit Opposing Motions for Summary Judgment (Document No. 79) that he has been acting as his brother's personal representative since December 31, 1992. Affidavit, ¶ 2.

 "[I]f there is a Federal Rule of Civil Procedure covering a particular issue in dispute between the parties, such a rule governs in a federal diversity action even if resort to state law would lead to a different result." *In re Asbestos School Lit.*, 768 F.Supp. 146, 150 (E.D.Pa.1991), *citing Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Under *Hanna v. Plumer*, "the question of relation back is procedural and therefore properly analyzed according to federal practice." *Nelson v. County of Allegheny*, 60 F.3d 1010, 1014 (3d Cir.1995). *See also Hess v. Eddy*, 689 F.2d 977, 980 (11th Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (district court "erred in applying Alabama's 'no relation back' rule in the face of a Federal Rule of Civil Procedure [17(a) ] that expressly authorizes and adopts the 'relation back' doctrine" in context of administration of estate and suit filed in federal court prior to administratrix receiving official representative status); *Brohan v. Volkswagen Mfg. Corp. of America*, 97 F.R.D. 46, 49 (E.D.N.Y.1983)(in similar context, Fed.R.Civ.P. Rule 17(a) applies by its plain language and, under *Hanna v. Plumer*, overrides New York law to the contrary).

Fed.R.Civ.P. 17(a) of the Federal Rules of Civil Procedure specifically addresses the issue of substitution, ratification or joinder of the real party in interest and the effect thereof on suits previously filed:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

In analyzing Rule 17(a), the Court of Appeals for the Eleventh Circuit concluded that:

The plain language of the Rule clearly provides that when an action is brought by someone other than the real party in interest within the limitations period, and the real party in interest joins or ratifies the action after the limitations period has run, the amendment or ratification relates back to the time suit was originally filed and the action need not be dismissed as time barred.

*Hess v. Eddy*, 689 F.2d at 980.

 Fed.R.Civ.P. 17(a) "sets forth a rule of procedure that is to be applied in federal courts . . . . even where the courts of the forum state have rejected the 'relation back doctrine.'" *Id.* at 981. Thus, if "the initial filing came within the applicable limitations period, the suit is not time barred," *id.*, even if Pennsylvania law would not recognize the relation back. *See Levinson v. Deupree*, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed.2d 1319 (1953), *relied upon in Hess*, (in the case of a wrongful death action brought by party not yet properly appointed as administrator of decedent's estate, and where the appointment occurs only after the statute of limitations has run, a federal court must allow the appointment to relate back to the time of the initial filing even if the forum state would not allow the relation back and would hold the action time–barred in its own courts).

 Although Paul Fortunato was not appointed administrator of decedent's estate until February 7, 1995, his post–appointment ratification of that suit has the same effect as if the action had initially been commenced in the name of the real party in interest pursuant to Fed.R.Civ.P. 17(a). Accordingly, the Pennsylvania statute of limitations does not bar plaintiff's claim, which, because it related

back to the timely complaint filed when the administrator's status was not yet official, was timely filed within the two–year statutory period.

## III. Qualified Immunity

■■■ Generally, governmental officials carrying out discretionary functions are shielded from liability for civil damages where their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pansy v. Preate,* 870 F.Supp. 612, 624 (M.D.Pa.1994), *citing inter alias, Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (additional citations omitted). "The issue of an official's objective good faith is purely a legal question, and the [Supreme] Court admonished that 'reliance on the objective reasonableness of an official's conduct *as measured by reference to clearly established law,* should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Capone v. Marinelli,* 868 F.2d 102, 104 (3d Cir.1989) (emphasis added), *quoting Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. *Harlow* qualified immunity is available and has been extended to police officials alleged to have engaged in unconstitutional police misconduct, including violations of the Fourth Amendment. *Anderson v. Creighton,* 483 U.S. 635, 643, 107 S.Ct. 3034, 3040–41, 97 L.Ed.2d 523 (1987).

Plaintiff alleges defendants violated decedent's Fourth, Fifth, and Fourteenth Amendment rights initially by using the S.E.R.T. to serve a misdemeanor arrest warrant when alternative, more reasonable methods of apprehending Fortunato were available, and by using excessive and deadly force against him in the execution of said arrest warrant. Plaintiff's claim must be analyzed under the Fourth Amendment's "objective reasonableness" standard, as the United States Supreme Court has made clear.

"Today we make explicit what was implicit in *Garner*'s [*Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ] analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process approach. . . .'

Determining whether the force used to effectuate a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 8 [105 S.Ct. at 1699], quoting *United States v. Place,* 462 U.S. 696, 703 [103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110] (1983).

*Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1871–73, 104 L.Ed.2d 443 (1988).

■■■ *Graham* reminds us the test of objective reasonableness under the Fourth Amendment "is not capable of precise definition or mechanical application," and that its proper application requires "careful attention to the facts and circumstances of each particular case. . . ." *Id.* at 396, 109 S.Ct. at 1872, *quoting Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979). Thus the court must consider and weigh "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id., quoting Garner,* 471 U.S. at 8–9, 105 S.Ct. at 1699–1700. Moreover, the "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . [and the] calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split–second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872. Finally, because the test is an objective one, the "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872 (citations omitted).

It may seem somewhat incongruous to apply the *Harlow* qualified immunity test to excessive use of force claims for, in a sense, we are asking did the police officers "'reasonably' act unreasonably?" *Anderson,* 483 U.S. at 643, 107 S.Ct. at 3040–41. As the district court stated in *Ramirez v. City of Reno,* 925 F.Supp. 681, 688 (D.Nev.1996):

> In the context of an excessive force claim, the qualified immunity defense takes on a paradoxical quality. The defendant must argue ... that although the force she used against the plaintiff was in fact unreasonable, that a reasonable person in the defendant's position could nonetheless have believed the degree of force employed to have been reasonable

According to *Ramirez,* the Court of Appeals for the Ninth Circuit, in light of the seeming paradox, has blended the two lines of inquiry because it is "impossible to disentangle the merits of a Fourth Amendment excessive force claim ... with the qualified immunity defense to that claim." *Id.* at 688–89.

While this Court agrees there is much overlap between the two inquiries, and that considerable conceptual nuancing may sometimes be necessary to keep separate the lines of inquiry, nevertheless, in this circuit the lines remain distinct. *Anderson,* 483 U.S. at 643–44, 107 S.Ct. at 3040–41; *In re City of Philadelphia Lit.,* 49 F.3d 945 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 176, 133 L.Ed.2d 116 (1995). *City of Philadelphia,* though it could not gain consensus of the fragmented panel on many points, nevertheless is illuminating on the application of the standards for determining whether defendants are entitled to summary judgment on the defense of qualified immunity to plaintiffs' claims of the use of excessive and, indeed, deadly force to effectuate an arrest.

*City of Philadelphia,* involved the highly-publicized confrontation between City of Philadelphia police officials and officers and other personnel and the radical group MOVE wherein police officers dropped an explosive device on the roof of the MOVE residence which resulted in a massive city fire which destroyed dozens of homes and killed 11 persons in the MOVE residence, including five children. Judges Greenberg, Scirica and Lewis each wrote opinions in *City of Philadelphia,* which affirmed the district court in part, reversed in part, and dismissed the appeal in part. Judges Greenberg and Scirica agreed that the individual defendants were entitled to qualified immunity from the excessive force claims which they analyzed under *Graham.* *Id.* at 970–73. Judge Greenberg first held that there had not been a seizure under *Graham's* objective reasonableness test, but for sake of argument assumed there had been a seizure, and reached the official immunity issue. On that issue, he agreed with Judge Scirica that the individual defendants were entitled to prevail, because a court "could not possibly say ... 'that in the light of pre-existing law the unlawfulness' of either dropping the explosive or letting the fire burn should have been apparent." *Id.* at 972, quoting *Anderson.*

Judge Scirica agreed with Judge Lewis, however, that the city was not entitled to summary judgment because a reasonable jury could conclude that the decision to employ the incendiary device was an excessive use of force, noting that under *Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980), the city does not automatically have qualified immunity from liability even if it can show the individual officials are immune. *Id.* at 974–75.

Judge Lewis and Judge Scirica agreed there had been a police seizure of the MOVE occupants and that the city was not entitled to summary judgment on qualified immunity grounds. *Id.* at 976. However, Judge Lewis did not agree that *Graham* provided the "proper analytical framework" for assessing the constitutionality of the individual defendant's use of force. Instead, he believed *Garner* delineates the appropriate standards governing the use of deadly force, and provides the proper test. *Id.* In Judge Lewis' view, *Garner* and *Graham* establish a "set of complimentary" Fourth Amendment principles: (i) reasonableness is the touchstone for any use of force in the context of an arrest; (i) where deadly force is used, its constitu-

tionality is tested by *Garner* and is unreasonable unless it is necessary to prevent escape and the officer has probable cause to believe the suspect poses a significant threat of death or serious injury to the officer or others; and (iii) where non–deadly force is sued, its constitutionality must be scrutinized according to the *Graham* factors. *Id.* at 978. Under the *Garner* analysis, Judge Lewis believed only one conclusion could be reached: "the City defendants used excessive force." 49 F.3d at 978.

On the individual defendants' qualified immunity defense, Judge Lewis of course agreed with the "majority" on the *Anderson/Harlow* "objective reasonableness" standards in general, but he would have held *Garner* was the "clearly established law" governing the defendants' use of deadly force. *Id.* at 979. Applying that "clearly established law," *i.e., Garner,* Judge Lewis found it "readily apparent to any reasonable official who possessed the same information ... at the time the explosive device was dropped, deadly force was not necessary to prevent the escape of the occupants" of the MOVE residence. *Id.* at 980.

■ In light of the objective qualified immunity standards as applied by *any* of the *City of Philadelphia* panel judges, this Court holds both the county and the state police defendants are entitled to qualified immunity from section 1983 liability under all of the circumstances.

The summary judgment record before the Court discloses the following. Decedent had been charged with aggravated assault, simple assault, resisting arrest and disorderly conduct arising out of a January 1992 incident in which he allegedly assaulted an Indiana Borough Police Officer. While these charges were pending, decedent's defense attorney moved to withdraw his appearance as a result of his client's "uncooperative, belligerent and threatening" behavior including a threat made to the attorney that "I better not be convicted; I have a sawed off shot gun." Motion to withdraw, Appendix to Defendant's Motion for Summary Judgment ("Appendix"), Exhibit B. On December 4, 1992, Fortunato received a notice to appear for a jury trial on December 14, 1992; he failed to appear. On December 7, 1992, Fortunato sent a bizarre letter to defendant Michael Handler, District Attorney for Indiana County, rejecting the "persecuting attorney's" "Christmas party invitation" and expressing Fortunato's steadfast refusal to "participate" in the pending criminal proceedings against him. Appendix, Exhibit C. Said letter made various obscene and sarcastic remarks in reference to the prosecution against decedent, including:

> Any extended insistence beyond the date of this letter conveying or insinuating *any* physical insistence on your part to physically procure my bodily self for your "Court House Club" party ceremonies will be *viewed as an aggravated assault with intent to kidnap and will be met with extreme hostile objection.* Do you understand? ...

> BUG OFF. BUTT OUT. BEAT IT. DROP DEAD. FUCK OFF. TAKE A HIKE. EAT SHIT. GET OFF MY CASE. *YOU'RE FIRED.*

> ... In other words, Turkeyshit, take your ... Information 187 and stick it UP YOUR ASS. And remember what I wrote earlier: Any threat on my privacy, life, liberty and happiness this Christmas season *will be met* with extreme hostile objection EXTREME HOSTILE OBJECTION....

Fortunato's letter to Handler, December 7, 1992, Appendix, Exhibit C (some underscoring added). Shortly thereafter, Fortunato contacted the district attorney's office by telephone on several occasions and conveyed threatening messages to staff members. Affidavit of Probable Cause, Appendix, Exhibit E.

In response to these threats, defendant Chief County Detective Robert Fyock filed two criminal complaints accompanied with his affidavits of probable cause charging Fortunato with harassment by communication and terroristic threats under sections 5504(a)(1)(2) and 2704 of the Pennsylvania Crimes Code. Based on these complaints, Indiana Borough District Justice Richard Orendorff issued arrest warrants. Appendix, Exhibits F and G.

On December 29, 1992, at 5:14 p.m., an anonymous female telephoned the Indiana Borough Police Department and stated she worked with Paul Fortunato and that he stated to her he hopes the police come to his house to arrest his brother who had a shotgun and would shoot them. State Police Defendants, Statement of Material Facts, ¶ 21. Plaintiff disputes actually making these remarks, but does not dispute that the anonymous female called the Indiana Police and made such statements. Affidavit in Opposition.

Deciding then that Fortunato's arrest would not be peaceful, Detective Sergeant Russell States and Detective Fyock consulted with state police officials and decided to seek the assistance of the "S.E.R.T." in serving the arrest warrant. Plaintiff contends defendant Handler also participated in the decision to seek the assistance of the S.E.R.T. On December 30, 1992, Detective Sergeant States informed State Trooper Knezovich of the S.E.R.T. that Fortunato had been arrested in January 1992, after pulling a knife during a scuffle with arresting officers.

Copious police reports, telephone logs, contemporaneous notes and other documentary evidence produced by defendants in support of summary judgment disclose the following events. S.E.R.T. arrived on December 31, 1992, and was deployed around decedent's residence at approximately 7:00 a.m. Shortly thereafter, negotiators contacted decedent by telephone who indicated he was not coming out and that the arrest warrant was not valid because it was the last day of the year. During a second telephone call, Fortunato refused to come out unless he got an assault rifle team and four and a half million dollars.

At 9:45 a.m., Paul Fortunato arrived and was permitted to speak by telephone with his brother around 11:00 a.m. The conversation started out well, but then Paul started agreeing with Robert and asked to see the charges. The telephone call was then terminated by a negotiator.

At 11:10 a.m., tactical teams broke windows and attempted to use a battering ram on the front and rear doors so that they could inject tear gas into the residence. At 11:59 a.m., three state police officers attempted to enter through the back door, whereupon decedent fired a semiautomatic shotgun through a rear window, wounding Trooper Kolson and Lieutenant Maholtz.

At 12:11 p.m., negotiators called decedent who said he was going to "defend his space." As the S.E.R.T. prepared to introduce tear gas, Fortunato received several warnings to surrender or get down on the floor. Negotiators also told Fortunato that if he came out of the house, he would not be harmed.

Shortly thereafter, Fortunato exited a window with a pistol and knife in his waistband, holding a shotgun in his right hand. After Fortunato jumped from the window, he was warned "State Police! Drop the gun! Get down on the ground!" Fortunato turned in the direction of these voices, raised his shotgun to his shoulder, and pointed it at Trooper Swartzlander. Trooper Swartzlander fired two rounds at Fortunato, striking him once in each thigh. The impact of the shots spun Fortunato "completely around" and forced him into a half squat. Trooper Doman shouted at Fortunato to stay down. Fortunato again raised his shotgun to his shoulder and pointed it in the direction of Troopers Doman and King. Defendants King, Smith, Martsolf, and Maholtz simultaneously fired one round at Fortunato, killing him. It is not certain whether decedent's gun was also discharged at this time.

Plaintiff disputes whether Fortunato fired his weapon in the direction of the officers upon his exit or whether it was even fired then. Plaintiff also disputes some of the other particulars of these events, although the record references offered to dispute same do not actually do so. For example, Paul Fortunato's affidavit claims, without any specifics, that the S.E.R.T. did not permit him to "adequately speak to my brother." Affidavit in Opposition, ¶ 7. The evidence offered by defendants refutes this bare assertion. Similarly, plaintiff disputes some of the details of decedent's exit from the residence, such as how he held the shotgun and where he aimed it, but again offers no details and no specific evidence to counter defendants' evidence. Perhaps more importantly, plaintiff does not

dispute that decedent exited his residence rather than surrender to the police, armed with a knife, a pistol and a shotgun, having earlier shot and wounded two S.E.R.T. members, and refused to drop his weapons or stop his movement.

Plaintiff also contends defendants knew or should have known decedent suffered from some mental disability that, presumably, would have rendered him amenable to some treatment under applicable mental health procedures which would have obviated the need to serve an arrest warrant. Plaintiff's evidence of decedent's mental condition that should have alerted police to use mental health procedures consists solely of decedent's letter of December 7, 1992, and his telephone conversations the day of his attempted arrest and death. Plaintiff's Statement of Material Facts, ¶ 15. Moreover, in response to interrogatories, plaintiff stated the decedent did not suffer from and had never been treated for any mental illness or disability. State Police Defendants' Statement of Material Facts, ¶ 15.

Plaintiff claims, principally, that alternative methods of apprehending Fortunato should have been attempted, such as mailing a copy of the criminal complaint to him or seeking to have him committed through the Pennsylvania Mental Health and Mental Retardation Act of 1966 procedures. Had such alternative procedures been tried, decedent would not have been placed in a position whereby he would feel so threatened that he would have to shoot his way out. However, "[t]he Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases." *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir.1994), (emphasis added) *citing, inter alia, Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (rejecting estate's argument that police officers used poor judgment in setting up a hostile coercive confrontation which provoked decedent to come at officer with a poker, prompting the officer to shoot and kill him.)

As Judge Lewis observed in *City of Philadelphia*, it is not the province of the courts in scrutinizing alleged police misconduct "to provide alternatives to unlawful police action.

Instead, we are to evaluate the lawfulness of what *did* occur . . ." *City of Philadelphia*, 49 F.3d at 981. *See, e.g., Plakas*, 19 F.3d at 1149–50 ("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of deadly force is reasonable under *Garner* . . . and *Graham* . . . We do not return to the prior segments of the event and, in light of hindsight, reconsider whether the prior police decisions were correct. Reconsideration will almost always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean *when* we say we refuse to second–guess the officer."); *Carter v. Buscher*, 973 F.2d 1328, 1239, 1332 (7th Cir.1992) (although police officers' "dubious" scheme to arrest decedent was described as "stranger than fiction . . . like the script from *Keystone Cops*," Court of Appeals quickly rejected argument that the dubious scheme violated the Fourth Amendment because it unnecessarily created the confrontation which led to use of deadly force; court holds that "pre–seizure" conduct is not subject to Fourth Amendment scrutiny; a "contrary holding would create a cottage industry wherein the federal courts would be called upon to second guess police officers as to every discretionary decision regarding time and place of arrest."); *Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir.1994), quoting *Carter* ("We do not look to events that occurred approximately one hour prior to Mr. Bella's actual seizure to determine if the seizure was reasonable."). *See also Schulz v. Long*, 44 F.3d 643 (8th Cir.1995) (district court properly excluded evidence of pre–seizure, pre–deadly force police conduct, "evidence that officers . . . created the need to use force by their actions prior to the moment of seizure is irrelevant"); *but cf. Alexander v. City and County of San Francisco*, 29 F.3d 1355 (9th Cir.1994) (fact question precluded summary judgment for police officers on claim of excessive, deadly force where officers accompanying local health department inspectors stormed house of elderly, half–blind recluse who had threatened to shoot anybody who attempted to enter his home).

The Court finds that the decision to use the State Police S.E.R.T. to execute the warrant objectively was quite reasonable: the Indiana Borough police were authorized to serve an arrest warrant for communication by harassment and terroristic threats;[1] decedent had threatened his attorney, district attorney Handler and members of Handler's staff; Fortunato had allegedly resisted arrest and assaulted a police officer in January of 1992 with a knife; and police received an anonymous telephone call informing them that decedent had a gun and would shoot anyone who tried to arrest him. Furthermore, since Fortunato had failed to appear at his jury trial as required by the criminal summons of December 4, 1992, and served notice he had no intentions of ever attending the " 'Court House Club' party," it was reasonable to assume that any attempt to serve a criminal complaint through the mail would not have been successful. In light of this history of threats, Fortunato's prior assault of a police officer, and the nature of the crimes charged in the arrest warrant, defendants reasonably could have concluded that Fortunato would pose an immediate threat to the safety of any officers seeking to execute an arrest warrant, as proved to be the reality. Obviously, the defendants did not violate any "clearly established law," *Harlow*, in implementing the plan of arrest by S.E.R.T.

▪ To the extent plaintiff alleges defendants violated Fortunato's Fourth Amendment rights by fatally shooting him rather than using other means of apprehending him once he had exited his residence, this theory of relief cannot be sustained on the record before the Court. The Supreme Court set down the parameters under which deadly force may be used in *Tennessee v. Garner*:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threat-

ens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11–12, 105 S.Ct. at 1701. Again, the inquiry is not whether deadly force might somehow have been avoided, but whether the use of deadly force was reasonable under all of the circumstances. *See, Plakas v. Drinski*, 19 F.3d at 1148 ("There is no precedent in this Circuit (or any other) which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.")

Similarly, under Pennsylvania law, the use of deadly force is justified where the officer reasonably believes it to be necessary to prevent death or serious bodily injury. 18 Pa.C.S. § 508(a)(1). *See City of Philadelphia*, 49 F.3d at 953, n. 5 (Greenberg, J.), and 49 F.3d at 979 n. 2 (Lewis, J.).

Fortunato had already demonstrated his willingness to use deadly force himself in shooting two police officers as they tried to enter his residence through the back door. Shortly thereafter, Fortunato stated to a police negotiator that he intended to "defend his space." When he exited his residence to avoid tear gas, armed with two guns and a knife, Fortunato ignored police directions to drop his gun and get on the ground. Initially, Fortunato turned toward the voices and aimed his gun toward a trooper, or at least shouldered his weapon. After being shot by Trooper Swartzlander, Fortunato again ignored the directions of S.E.R.T. members and pointed his gun in the direction of Troopers Doman and King.

Seeing Fortunato's gun pointed in the direction of fellow police officers, and in light of the circumstances enumerated above, particularly the fact that Fortunato already had

---

1. Pa.R.Crim.P. 102(b)(2) in effect at the time of the seizure in this case, provided that, in a criminal complaint which is a court case, the issuing authority "shall ... issue a warrant of arrest when: ... (2) the issuing authority has reasonable grounds for believing that the defendant will not obey a summons." (current version at Pa. R.Crim.P. 75(b)). Moreover, a "warrant of arrest shall be executed by a police officer." Former Pa.R.Crim.P. 124(b) (current version at Pa. R.Crim.P. 122).

shot two police officers, the state police defendants' beliefs that the lives of their colleagues were in immediate danger was not unreasonable. Indeed, it is hard to imagine what else they could have done. Under any of the panel members' views expressed in *City of Philadelphia*, these defendants are entitled to qualified immunity from liability for the use of deadly force, which did not violate the "clearly established law" of either *Graham* or the stricter *Garner*. Certainly the "majority" panel members (regarding qualified immunity for the individual officers and officials) in *City of Philadelphia* would not hesitate to find these defendants protected by qualified immunity, and neither would Judge Lewis because here there is no question the police officers acted in conformity with state law on the use of force, 18 Pa.C.S. § 508(a)(1), which state law received the seal of approval in *Tennessee v. Garner. City of Philadelphia,* 49 F.3d at 979 n. 2 (Lewis, J., dissenting on this issue).

Accordingly, the Court finds that because the defendants complied with the requirements of both *Graham, Garner* and Pennsylvania law regarding the use of deadly and non-deadly force, they did not violate "clearly established law," and are entitled to qualified immunity.

*State Law Claims.*

 Absent extraordinary circumstances, where the federal claims are dismissed on a motion for summary judgment, the district court should "ordinarily refrain from exercising pendent jurisdiction [over the state law claims]." *Rolo v. City Investing Co. Liquidating Trust,* 845 F.Supp. 182, 215 (D.N.J.1993) *aff'd,* 43 F.3d 1462 (3d Cir. 1994) (citations omitted). *See also Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir.1992) (once all federal claims have been dropped from the case, the case should either be dismissed or trans-ferred to the appropriate Pennsylvania Court of Common Pleas pursuant to 42–Pa.C.S. § 5103(b)).

There are no "extraordinary circumstances" which warrant the exercise of jurisdiction over the state claims, and the Court declines to exercise supplemental jurisdiction over the claims for assault, battery and intentional infliction of emotional distress, which will be dismissed without prejudice. Plaintiff may attempt to pursue these claims in state court pursuant to 42 Pa.C.S. § 5103(b). *See Williams v. F.L. Smithe Mach. Co.,* 395 Pa.Super. 511, 577 A.2d 907 (1990).

### Conclusion

For the reasons set forth above, defendants' motions for summary judgment will be granted in their favor, and plaintiff's federal claim dismissed with prejudice. Plaintiff's state claims will be dismissed without prejudice to plaintiff's right to take the necessary steps to certify this case to the appropriate state court pursuant to 42 Pa.C.S. § 5103(b). An appropriate order will follow.

### ORDER

**AND NOW,** this 21st day of August, 1996, it is hereby **ORDERED** that the county defendants' **Motion for Summary Judgment** (Document No. 66) is **GRANTED** in defendants' favor, and plaintiff's federal claim pursuant to 42 U.S.C. section 1983 is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that the state police defendants' **Motion for Summary Judgment** (Document No. 71) is **GRANTED** in defendants' favor, and plaintiff's federal claim pursuant to 42 U.S.C. section 1983 is **DISMISSED WITH PREJUDICE;**

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the Pennsylvania common law claims of assault, battery, and intentional infliction of emotional distress, which are **DISMISSED WITHOUT PREJUDICE** to plaintiff's right to take the necessary steps to

certify this case to the appropriate state court pursuant to 42 Pa.C.S. section 5103(b).