Larry WHITLOW, Individually and as Administrator of the Estate of Robert Whitlow, Deceased Appellant, Plaintiff–Appellant,

v.

CITY OF LOUISVILLE, et al., Defendants–Appellees.

No. 00–6557.

United States Court of Appeals, Sixth Circuit.

July 1, 2002.

Before BATCHELDER, CLAY, Circuit Judges; and CARR, District Judge.*

CLAY, Circuit Judge.

Plaintiff Larry Whitlow, personal representative for the estate of Robert Whitlow ("Whitlow" or "Decedent"), appeals the district court's October 11, 2000 order granting summary judgment, pursuant to Fed.R.Civ.P. 56, in favor of Defendants— the City of Louisville; Doug Hamilton, chief of the Louisville Police Department; and 20 unnamed city police officers—as to Plaintiff's federal constitutional and state law claims. Plaintiff alleges that Defendants violated Decedent's Fourth Amendment Rights by using excessive force in effecting his arrest, which resulted in his death. He further alleges that Decedent was deprived of constitutional rights as a result of, *inter alia,* the city and Hamilton's failure to adequately train its officers. Plaintiff further asserts a state-law wrongful death claim against Defendants. For the reasons that follow, we **AFFIRM** the order of the district court.

## BACKGROUND

On the morning of Thursday March 13, 1997, Officer Joe Thompson contacted Sergeant Charles Cooper by radio and requested that Cooper's unit investigate an incident of domestic violence. Thompson told Cooper that Alfredia Davis had been beaten by her boyfriend, Robert Whitlow, and that Whitlow had held her captive at his house for several days against her will. Davis had contacted Thompson from her sister's house at 3230 Duvalle Dr. Cooper proceeded to that address, and was informed that another detective would meet him there.

When Cooper arrived at the address, he stated that Davis was being treated by the emergency medical service and noticed "severe bruising to the face and to the eyes." He stated that she was complaining of pain to her head, jaw and ear. She complained of a loss of hearing and stated that she believed her hand was broken. Cooper decided that he would conduct a quick interview with Davis to ascertain what had taken place, and the other detective at the scene, Jackie Roberts, would

---

* The Honorable James G. Carr, District Judge, United States District Court for the Northern District of Ohio, sitting by designation.

accompany Davis to the hospital to conduct a more detailed interview.

Davis told Cooper that several days earlier, she and Whitlow (Decedent) were having a conversation in a car, and she asked Whitlow to take her home. She told him that she wanted to end their relationship. She stated that he became angry, pulled the car behind a store, and beat her. Davis then stated that he took her back to his house and would not allow her to leave for several days. Cooper stated that based on his training, Davis' injuries were consistent with her story. He stated that her bruises had darkened, which to him, meant that at least a couple of days had passed since the bruises were inflicted.

After his interview with Davis, Cooper went with other officers to Whitlow's residence to make a felony probable cause arrest without a warrant. However, no one answered the door, and the officers left.

Cooper then went to the hospital, where he claims that Davis provided additional information. He stated that she told him that Whitlow was a "gun fanatic." Davis stated that she believed that Whitlow would resist any attempt to be arrested and that "he carries guns on his person at all times inside the home. If he does not have a gun on his person he will have it within arm's reach. . . ." Cooper stated that Davis also told him that Whitlow had a bar "that is a locking device or a barricade device for his back door so that no entry could be made to the back door." Apparently, Whitlow had been robbed recently. However, Cooper stated that Davis failed to inform him of this. Davis told Cooper that Whitlow also had a rifle in the house, which she described as an AK–47. Davis admitted that she did not know anything about guns, but stated that Whitlow had told her that it was an AK–47 and that she had seen the gun. Cooper asked her to describe the gun, and from her description, he determined that the description was consistent with an AK–47. Cooper then obtained an arrest warrant for Whitlow, charging him with kidnapping, assault in the first degree and tampering with physical evidence.

Based on the information he had gathered, Cooper filled out a "Risk Assessment Matrix" ("Matrix"). The Matrix form contains various categories for which points are assigned. The more points attributed to the various categories (or risk factors) on the Matrix, the more likely the service of the warrant will be considered a higher risk to serve on the suspect. If the score on the Matrix form reaches 25 points or more, then the S.W.A.T. Team is required to serve or execute the warrant. The Matrix Cooper filled out for Whitlow shows total points of 30. After completing the Matrix, Cooper determined that the S.W.A.T. Team should serve the warrant on Whitlow. According to the Matrix in question, the following number of points were assigned in the following categories: (1) "Search warrant is for evidence of crime against person," 2 points; (2) "Arrest warrant is for crime against person," 2 points; (3) "Subject of warrant has used firearms during the commission of crimes," 10 points; (4) "Location is fortified, requiring specialty breaching, or the subject has guard dogs." 10 points; and (5) "Subject of warrant is always armed," 6 points. In addition, the Matrix form states that "If a fully automatic weapon has been identified as used in the commission of the crime or the subject has access to an automatic weapon and this information has been confirmed the SWAT TEAM will serve the warrant." At the bottom of the Matrix form filled out in this case was a notation stating "Add—Report of AK–47 Assault Rifle on Premises."

Cooper also ran an arrest records check on Whitlow and saw that in 1990 he had been charged with assault in the second degree and assault in the fourth degree, and that in 1993 he had been arrested for several counts of wanton endangerment in the first degree. The record in the 1993 incident indicated that Whitlow had fired a gun at several people in his yard. According to Plaintiff, the actual facts of this incident were that Whitlow previously had been burglarized and he fired his weapon in the air to scare away individuals whom he believed were trying to burglarize him.

Cooper contacted Donald Brubink, who was then a lieutenant, and commander of the S.W.A.T. Team, and informed Brubink that the S.W.A.T. Team would be needed to gain entry to Whitlow's home that evening. Brubink testified at his deposition that Cooper had contacted him earlier that day and tentatively told him that the S.W.A.T. Team might be needed but at that point, Cooper was unsure.

On the evening of March 13, 1997, the S.W.A.T. Team went to Whitlow's residence and parked about a half block from his house. The officers approached in a line. Detective Whobrey approached Whitlow's front door first and pulled open the screen door. Detective McCartney followed Whobrey with a door ram. McCartney yelled "police search warrant," and then hit the door with the ram and stepped aside. One officer threw in a "distractionary" device. The device is meant to distract and disorient. The device makes a loud bang and within two or three seconds gives a flash, similar to a camera. Sometimes smoke follows. After the door opened, Whobrey, who apparently could see Whitlow, yelled either "he's got a gun" or "gun." Estes went in and also yelled "police, search warrant." Estes saw Whitlow standing to his left holding a pistol, and Whitlow's arm was extended. Estes

says at that point, had the gun discharged, the bullet likely would have hit his lower extremities. Estes stated that he yelled "police, drop it." Whitlow instead raised the weapon and pointed it directly at Estes. Estes fired his weapon.

The gun Estes used was a Hecker & Koch MP5 submachine gun, which has four settings, ranging from a safety setting to a setting that will fire as long as the trigger is depressed and the magazine is full. Estes had his gun set at the three-round burst, which meant that when he depressed the trigger, the gun would discharge three rounds. Estes testified that he placed it at that setting because of information he had received that there was no one else in the house with Whitlow, that Whitlow had an AK–47, and that after Whitlow let Davis go, he told her that he knew she was going to call the police and to tell them he would be waiting for them.

After firing upon Whitlow, Estes stated that he did not know whether he had actually hit him. Whitlow swung around to the left, as if was going to the front bedroom. Whitlow had in fact been hit. Officers entered the home and saw Whitlow lying in the hallway. They observed Whitlow's feet moving. One of the officers shouted "show me your hands, show me your hands." Officer Schellenberger told Estes to kick the pistol away from Whitlow, which Estes did. It is undisputed that the gun Whitlow was holding was unloaded.

At her deposition, the medical examiner stated that there were two gunshot wounds on Whitlow's body. The first entered the backside of the body on the right side. The second entrance wound was half way between the front and back of the body, just beneath the armpit. The examiner testified that Whitlow died of multiple gunshot wounds to the body. The examiner was unable to contradict the statement

Estes gave regarding how the shooting occurred.

After more than 18 months of discovery in this matter, on September 27, 1999, Defendants filed a motion for summary judgment. On October 11, 2000, the district court granted Defendants' motion, and Plaintiff filed a timely notice of appeal on November 9, 2000.

## DISCUSSION

### I.

This Court reviews a district court's order granting summary judgment *de novo. Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir.2000). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the evidence and draw all reasonable inferences therefrom in a light most favorable to the non-moving party. *Williams v. Int'l Paper Co.,* 227 F.3d 706, 710 (6th Cir.2000). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II.

Plaintiff contends that the district court erred in granting summary judgment in Defendant's favor inasmuch as the police conduct in this case in executing the search and arrest warrants on Whitlow's property was objectively unreasonable under the Fourth Amendment to the United States Constitution. Plaintiff contends that the police erred in failing to conduct an adequate investigation into the factors it used to determine that the S.W.A.T.

Team was needed to serve the warrant. He essentially contends that the police were negligent or reckless in the manner in which they investigated Davis' allegations and completed the Matrix, and by their negligence and the surprise tactics employed in executing the warrant, they created the need for the deadly force that was used. Finally, Plaintiff contends that the district court erred in granting summary judgment with regard to his state law wrongful death claims.

### A. Federal Claims

Plaintiff sues the City of Louisville, and in their official capacities, Police Chief Hamilton and 20 unnamed officers. In his complaint, Plaintiff identifies only Police Chief Doug Hamilton by name, and states that he "is sued in his official capacity as Chief of Police of LPD." (J.A. at 3, ¶ 4.) As for the 20 John Does, Plaintiff alleges that these officers "acted in their official capacity as agents, servants, and employees of Defendant City." *Id.* at ¶ 5. No where does he name any Defendant in his or her individual capacity. Thus, as Plaintiff only sues the city and the individual Defendants in their official capacities, his claims against the individual Defendants still are actually claims against the city. *McMillian v. Monroe County, Ala.,* 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) ("We have explained that a suit against a governmental officer in his official capacity is the same as a suit against [the] entity of which [the] officer is an agent.") (citations and internal quotation marks omitted); *Stemler v. City of Florence,* 126 F.3d 856, 864 n. 8 (6th Cir.1997) (holding that since plaintiff's estate sued officer in his official capacity only, claims would be treated as against the county for which he was an agent).

It is axiomatic that " § 1983 does not impose vicarious liability on a municipali-

ty" for its agent's constitutional torts. *Id.* at 865. "Therefore, in order to state a claim against a city or a county under § 1983, a plaintiff must show that his injury was caused by an unconstitutional 'policy' or 'custom' of the municipality." *Id.* (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("It is only when the execution of the government's policy or custom . . . inflicts the injury [of which the plaintiff complains] that the municipality may be held liable under § 1983.").

A failure to train can form the basis for a municipality's liability under § 1983, "where the failure to train amounts to *deliberate indifference* to the rights of the persons with whom the police come into contact." *Id.* at 387; *Brown v. Shaner,* 172 F.3d 927, 930 (6th Cir.1999) (same). Deliberate difference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler,* 126 F.3d at 865. "A showing of simple or even heightened negligence will not suffice." *Id.* (citations omitted).

In analyzing the issue of the city's liability, "the focus must be on adequacy of the training program in relation to the tasks the particular officer must perform." *City of Canton,* 489 U.S. at 390. It is not enough that a particular officer was trained unsatisfactorily to attach liability to a city, "for the officers' shortcomings may have resulted from factors other than a faulty training program," and "[i]t may be . . . that an otherwise sound program has occasionally been negligently administered." *Id.*

Moreover, where a person has suffered no constitutional injury at the hands of the individual police officer(s), then "the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). Thus, if Whitlow suffered no constitutional violation, then Plaintiff's claims against Louisville and Hamilton alleging that their lack of training and failure to supervise the individual officers resulted in Decedent's death, must fail. In other words, Plaintiff's claims against the city are dependent upon the existence of a constitutional violation by its officers. *Id.; Scott v. Clay County, Tenn.,* 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well."); *Doe v. Sullivan County, Tenn.,* 956 F.2d 545, 554 (6th Cir.1992) ("*Heller* simply reaffirmed that a determinative issue in § 1983 claims against municipalities is whether the plaintiff has suffered a deprivation of his constitutional rights.").

While Plaintiff does not challenge the validity of the search and arrest warrants issued in this case, he argues that the officers used excessive force in carrying out the warrants. Thus, he claims that Whitlow's constitutional rights were violated by the officers' use of excessive force.

A claim that the government used excessive force during the course of an arrest or other seizure is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* at 396 (citation omitted). In "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a

careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citation omitted). Undoubtedly, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner,* 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Therefore, only in rare instances may an officer seize a suspect by use of deadly force. *Id.* The Supreme Court has held that where a suspect poses an "immediate threat" either to the officer or others, deadly force may be justified. *Id.* at 11.

Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12.

The Supreme Court instructed that courts should examine the totality of the circumstances in determining whether a particular type of force used was reasonable. *Id.* at 8–9.

When analyzing claims of excessive force, this Court has adopted the view of doing so in segments. *Dickerson v. McClellan,* 101 F.3d 1151, 1161 (6th Cir. 1996) (holding that in excessive force action involving use of deadly force, review should be limited to officers' actions in the moments preceding the shooting; other actions leading up to that moment deemed irrelevant).

*Dickerson* outlines the analysis that applies in cases such as the one now before the Court. In *Dickerson,* police received a call from the decedent's neighbor that she heard nine gun shots fired from inside the decedent's home and that the decedent was believed to be drunk. *Id.* at 1154.

Officers arrived at the scene and approached the house. They heard a male voice inside the house yelling in a threatening tone but could see no one. "Without knocking or announcing their presence, the officers entered the house with their guns drawn through an unlocked storm door...." *Id.* Upon entering they smelled gun powder, and heard a male's voice yell, "I've got something for your ass." *Id.* One of the officers "immediately heard the cylinder close on a revolver." *Id.* At that point, the facts were disputed. The officers heard the decedent yell, " 'I'll get you ...' as he ran toward the front door." *Id.* A neighbor, who witnessed the incident from across the street, stated that as the decedent approached the front door, his arms were down by his side and before he opened the storm door, she heard a gun fire. *Id.* at 1154–55. The officers, however, recounted a different version of the facts. They testified that as the decedent left the house, he pointed a gun at one of the officers, and both officers fired.

Denying qualified immunity, the district court determined that the officers' entry of the home was unreasonable in light of the knock and announce rule and its exception, and that material factual issues existed as to the reasonableness of the force the officers used against the decedent. *Id.* at 1156. On appeal, the plaintiffs argued that the conduct of the officers preceding the shooting was relevant as to the issue of the reasonableness of the force used. *Id.* at 1160. "Specifically, plaintiffs contend[ed] that the officers should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry." *Id.* Although this Court recognized that the totality of the circumstances must be considered, it rejected such a broad approach in analyzing excessive force claims. Quoting the Seventh Circuit, this Court explained

The time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing.

*Id.* at 1161 (quoting *Plakas v. Drinski,* 19 F.3d 1143 1150 (7 Cir.), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994)).

Following precedent from this circuit and the reasoning of cases such as *Plakas,* this Court held that the plaintiff's claims regarding "excessive force" and those regarding violations of the "knock and announce rule" must be analyzed separately. *Id.* at 1162. Thus, whether the officers may have violated the knock and announce rule was an inquiry separate and distinct from whether in the moments preceding the shooting deadly force was justified.

Similarly, in *Boyd v. Baeppler,* 215 F.3d 594 (6th Cir.2000), this Court held that officers who had identified themselves as police were justified in using deadly force where a suspect, whom the officers had reason to believe had recently fired shots at several people, ran toward the officers with his gun pointed at them. *Id.* at 598, 605. Reversing the district court's denial of qualified immunity, the Court held that the dispositive issue was whether the suspect "presented an immediate threat to these officers to which they reacted with an unreasonable degree of force." *Id.* at 599. Having found the evidence supported such an immediate threat to the officers,

the Court granted summary judgment in favor of the individual officers.

This Court addressed the holdings in both *Dickerson* and *Baeppler* in *Claybrook v. Birchwell,* 274 F.3d 1098 (6th Cir.2001). In *Claybrook,* police exchanged fire with and killed a man who stood outside of a market holding a shotgun, but who, unbeknownst to police at the time of the gunfire, was acting as a security guard for his daughter-in-law, who worked at the store, while she carried to her car the day's proceeds from the store's unlawful gambling operation. *Id.* at 1099–1100. Three undercover officers witnessed the decedent with his gun and suspected that he was robbing the market. *Id.* at 1100. One of the officers radioed the police department to report the gunman's location and to request dispatch of a marked police car. *Id.* The decedent's daughter-in-law, Quintana, who was inside her car in front of the market, testified that she heard someone yell from the unmarked police car to her father-in-law (the decedent) to drop his weapon. *Id.* at 1101. The decedent retorted, "no, you drop your gun." *Id.* Quintana testified that she then heard a "firecracker" sound. She did not realize it at the time, but she had been shot. According to her, that shot was followed by other shots fired by both the decedent and the police. *Id.* One of the officers was then hit. *Id.* The decedent fled behind the market. *Id.* After this maneuver, another shootout ensued, and the officers eventually killed the decedent. *Id.*

The Court recognized that in *Dickerson,* this circuit had "embraced a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force was used." *Id.* at 1103. In *Claybrook,* the officers argued that the only relevant events to consider in determining whether deadly force was rea-

sonable was the final confrontation, where the decedent fled behind the market and the second shootout began. This they claimed was relevant because it was during this "segment" of events that the decedent lost his life. *Id.* at 1104. The Court rejected so narrow an interpretation of *Dickerson.* It agreed that pursuant to this circuit's precedent, the events would have to be "carved up," and it determined that the events were properly construed as occurring in three segments. The first segment was the officers' initial approach and confrontation of the decedent, which was in "clear contravention of Metro Nashville Police Department policy regarding procedures for under cover officers." *Id.* at 1105. The second segment was the initial shootout in front of the market, and the third encompassed the shots fired after the decedent fled behind the market. *Id.* The Court held that the last two segments were relevant to its inquiry because the plaintiffs' suit was brought "to contest all use of deadly force against their deceased father, and not only the shot that took his life." *Id.* Further, since there was a factual dispute based on Quintana's testimony as to who started the initial firefight, summary judgment was inappropriate. However, the Court refused to consider the reasonableness of the officers' action with regard to the first segment, i.e., the initial approach and confrontation of the decedent. Although the officers actions clearly contravened police policy, their conduct under *Dickerson* could not weigh into the consideration of whether the force they used in the moments preceding the shooting was reasonable. *Id.*

■ In the instant case, Plaintiff raises numerous challenges to the district court's grant of summary judgment. He argues that the police performed an inadequate investigation into the events that led to service of the warrant and that officers inadequately completed the Matrix. Plaintiff contends that officers should have performed a more thorough investigation into the case. For instance, he argues that had officers interviewed Whitlow's friends and neighbors, officers may have likely concluded that Davis "fabricated much of her story." Citing cases from other circuits, Plaintiff claims that the reasonableness of the officers' actions with regard to his excessive force claims must be viewed in the context of all the actions in which the officers engaged from the preliminary investigation of the matter until the time of the fatal shooting. We disagree. Based on the holdings in cases such as *Dickerson, Baeppler* and *Claybrook,* the investigatory steps taken to determine how the warrant would be served, and the completion of the Matrix, are not probative of whether officers, later that evening, were justified in using deadly force against Decedent. *See Claybrook,* 274 F.3d at 1104 (explaining that the " 'segmenting' rules of *Boyd* and *Dickerson* divided the analysis of the use of deadly force from the analysis of possible erroneous actions taken by the officers prior to shots being fired"). The bulk of the events about which Plaintiff complains occurred well before officers entered the residence and were confronted by Whitlow who undisputedly was armed.

Plaintiff argues that a seemingly broader standard has been adopted by the Tenth Circuit and asks that we employ that standard here. *See Allen v. Muskogee,* 119 F.3d 837, 840 (10th Cir.1997) (reasonableness of officers' actions must be judged on both whether the officers were in danger at the precise moment they used force and on "whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force"); *Sevier v. City of Lawrence,* 60 F.3d 695 (10th Cir.1995) (same). To the extent these cases announce a standard that differs from *Dickerson, Baeppler*

and *Claybrook*, they must be rejected. *See e.g., Dickerson*, 101 F.3d at 1160–61 (rejecting plaintiff's argument that in analyzing excessive force claims, the officers should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry). In addition, the factual disputes regarding the shootings in both *Allen* and *Sevier* played a large role in that court determining that summary judgment was inappropriate. For instance, in *Allen*, 119 F.3d 837, officers shot and killed a man, known to be suicidal, after they approached his car and tried to remove his gun which lay next to him in the vehicle. There were eyewitnesses to the incident and factual disputes as to whether one of the officers "ran 'screaming'" up to the car, and shouting to the decedent to exit, or whether the officer approached the car cautiously and tried talking to the decedent to hand over his gun. *Id.* at 841. The court stated that the officers' actions with regard to their encounter with the decedent took ninety seconds, and as such "were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the reasonableness inquiry." *Id.* In *Sevier*, 60 F.3d 695, the plaintiffs phoned police to request assistance with their son, who had twice before tried to commit suicide, and whom they found in his room with a butcher knife on his lap. *Id.* at 697. In relaying their version of what took place after they arrived at the residence, the officers asserted that the decedent lunged with the knife in a raised position, while the plaintiffs claimed that officers shot the decedent while he was standing with the knife at his side. *Id.* at 698. The court found the factual dispute as to how the shooting occurred to be "highly material." *Id.* at 700–01 (finding also relevant "whether the officers precipitated the use of deadly force by their own actions during the course of the encounter *immediately prior to the shooting*") (emphasis added).

■ In the instant case, because of the short period of time between the officers' entry into the home and the shooting, under *Dickerson* and its progeny, all the facts that occurred during that time are relevant to the reasonableness inquiry. *Claybrook*, 274 F.3d at 1104–05. Officer Estes testified at his deposition that the S.W.A.T. Team arrived at Whitlow's residence, and lined up outside his door. The following events took place in a matter of seconds. Detective Whobrey, who was first in line, pulled open the screen and Detective McCartney yelled "police, search warrant," and hit the door and opened it with a door ram. At some point, a distractionary device was thrown into the residence. Whobrey yelled either "gun" or "he's got a gun." Estes yelled, "police, search warrant." Estes stated that he saw Whitlow holding a pistol, and that it was pointed toward Estes' lower extremities. Estes stated that he yelled, "police, drop it," but instead Whitlow raised his weapon so that it was pointed directly at Estes. At that point, Estes fired his weapon. Three rounds discharged. Two struck Plaintiff.

Focusing only on the moments preceding the shooting, as we must, the only reasonable inference that can be drawn from the facts of the instant case is that when Whitlow pointed his gun at Estes after being told to drop it, and Estes fired, Estes was acting in self-defense. As the Supreme Court held, where a suspect poses an "immediate threat" either to the officer or others, the officer may use deadly force. *Garner*, 471 U.S. at 11; *see also Dickerson*, 101 F.3d at 1163 (explaining that defendants correctly explicate the law that where a suspect "threatens an officer with a weapon, deadly force is authorized in self-defense").

■ Plaintiff, however, counters that by Defendants' own admission the distractionary device thrown into Whitlow's residence was meant to disorient and distract via a loud noise, flash and smoke. Thus, he argues that a reasonable jury could find that Whitlow did not realize he was dealing with police. We disagree. Estes testified that the device is designed to divert the person's attention, and to distract him so that officers can "get on top" of him before he has a chance to get a gun or shoot. (J.A. at 307.) The device gives off a light, akin to a camera flash, and a boom. Sometimes smoke is emitted. However, there is no evidence, expert or otherwise, that the device distracts a suspect such that he is unable to hear, or, more importantly, that it impaired Whitlow's senses such that he would have been incapable of understanding repeated shouts of the words "police" and "search warrant." Other than speculation, there is simply no evidence that because of the distractionary device, Whitlow did not understand he was dealing with the police, who undisputedly were in full police gear and repeatedly shouted "police" and "search warrant." Further, contrary to a direct command by Estes to drop his weapon, Whitlow raised his gun and pointed it directly at Estes. Even construing the evidence in Plaintiff's favor, Plaintiff has failed to show that Estes' use of deadly force was objectively unreasonable. *Garner*, 471 U.S. at 11.

There is no evidence that contradicts the statements of the officers. Unfortunately, Whitlow was the only other eye witness to the incident. Plaintiff attempts to raise a material issue of fact as to the path of the bullets by pointing out in his brief that the coroner's report states that the first bullet entered the right back area and the second bullet entered at the right side of the chest. He argues that considering the path of the bullets, Whitlow could not have been shot in the manner described by Estes. He provides no expert testimony to support his opinion. Further, the evidence is to the contrary. The medical examiner claimed that based on the location of the wounds, she could not within a reasonable degree of medical certainty dispute Estes' statement of how the shooting occurred.

■ As indicated, Plaintiff sues Defendants in their official capacities. Thus, his failure to train and supervise claims are against the municipality. *McMillian*, 520 U.S. at 785 n. 2. In order to assert such claims, he must show that Whitlow suffered a constitutional violation at the hands of the officers. *Heller*, 475 U.S. at 799. Plaintiff fails to make this showing and his federal claims against the municipality must fail.[1] *Id.*

## B. State–Law Claims

■ Pursuant to Kentucky law, if the death of a person results from injury inflicted as a result of the negligence of others, the deceased's estate may recover damages. Ky Rev. Stat. Ann. § 411.130 (Banks–Baldwin 1994). Plaintiff argues that his wrongful death claim is based on Defendants' negligent acts which led to the foreseeable conflict which killed Whitlow. He essentially argues that the officers' use of force was unjustified because they negli-

---

1. In any event, Plaintiff's failure to train and supervise claims pertaining to completion of the Matrix and/or investigation into Davis' statements to Cooper, which ultimately resulted in the S.W.A.T. Team executing the warrant, at most sound in negligence. As explained earlier, allegations of "simple or even heightened negligence" are insufficient to support municipal liability under 42 U.S.C. § 1983. *Stemler*, 126 F.3d at 865. After reviewing the record *de novo*, we believe Plaintiff has proffered insufficient evidence to show that the city's training programs were administered with deliberate indifference. *Id.*

gently forced the armed confrontation with a man who had no idea he was wanted and likely no idea who was confronting him. As a preliminary matter, Plaintiff's contentions lack evidentiary support. Even assuming Whitlow did not know officers were looking for him, there is no evidence that Whitlow did not know it was the police who had come into his home. The undisputed testimony is that the officers shouted "police" and "search warrant" several times in the short exchange between the officers and Whitlow. Thus, the evidence supports an inference that Whitlow did realize who was coming into his home and was not, as Plaintiff argues, justified in pulling a gun on the officers in self-defense. *See Baze v. Commonwealth*, 965 S.W.2d 817, 822 (Ky.1997) ("Even though a defendant may believe that deadly physical force is necessary to protect himself, . . . the use of such force is not justifiable when the defendant is resisting arrest by a police officer, . . . acting under color of official authority and using no more force than reasonably necessary to effect the arrest even [if] the arrest is unlawful."). Further, even if Whitmore grabbed the gun in self-defense, the undisputed testimony is that he raised it, and pointed it directly at Estes, although he was told to drop his gun.

The district court reasoned that assuming the officers were negligent in completing the Matrix and deploying the S.W.A.T. Team, the act of Whitlow pointing the gun at the officers was an intervening cause that resulted in Whitlow's death. Thus, Plaintiff's negligence claim failed. Despite Plaintiff's arguments to the contrary, we agree.

> Under Kentucky law,
> if the officer, in arresting or preventing escape, in such cases, meet with resistance, if the offender, for example, be armed and offers forcible resistance or

threatens the officer and in connection with such threat assumes a menacing attitude toward the latter, he may oppose with sufficient force, in the exercise of sound judgment, to overcome resistance, even to the taking of life; otherwise the law would go unenforced and the officer be at the mercy of the offender.

*Siler v. Commonwealth*, 280 Ky. 830, 134 S.W.2d 945, 947 (Ky.1939).

In situations such as the instant case, where an armed suspect threatens the life of an officer who is attempting to make an arrest, the officer is permitted to use deadly force. *Id.*

As explained above, Estes ordered Whitlow to drop his gun, but according to the officer, he raised it instead and pointed it directly at Estes. Therefore, any negligence on the officers' part in completing the Matrix, such that the S.W.A.T. Team was not required to execute the warrant, was not the proximate cause of Whitlow's injury. Rather, it was his pointing the gun directly at Estes. *Cf. City of Florence v. Chipman*, 38 S.W.3d 387, 394 (Ky.2001) (finding that officers who placed drunk woman, allegedly against her will, in her boyfriend's truck, which crashed, did not cause her death; boyfriend stated that the couple began fighting and as a result he ran off the road; thus the ensuing fight resulted in the fatal crash).

## CONCLUSION

For the forgoing reasons, the district court appropriately granted Defendants' motion for summary judgment, and we therefore **AFFIRM**.