Christopher **SAMPLE**, Plaintiff,

v.

Jason **BAILEY**, **PTL.**, et al., Defendants.

No. 5:04CV344.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 24, 2004.

---

David C. Sheldon, Ashtabula, OH, Wesley A. Johnston, Wadsworth, OH, Craig T. Weintraub, Cleveland, OH, for Plaintiff.

Bruce H. Christensen, Jr., Patricia Ambrose Rubright, Akron, OH, for Defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. Introduction

Plaintiff, Christopher Sample, suffered seven gunshot wounds when he was shot by Defendant, Jason Bailey, a City of Akron Police Officer. Sample brings this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (2003)[1], contending that Bailey used unreasonable force[2] against him thereby violating his rights under the Fourth Amendment of the United States

---

1. Bailey has also asserted the following claims: assault and battery; negligent training and supervision; negligence and gross negligence; intentional infliction of emotional distress; excessive and unreasonable use of force; and negligent infliction of emotional distress.

2. In this Opinion, the Court may use the terms "unreasonable force" and "excessive force" interchangeably. In addition, when the Court begins its analysis of Bailey's qualified immunity defense, it will use the term "deadly force" to refer to Bailey's shooting of Sample.

Constitution. Bailey denies that he used unreasonable force against Sample. Based on this contention, Bailey now moves for summary judgment on the grounds of qualified immunity. (*See* Doc. No. 15.) Sample has filed an Opposition to Bailey's Motion for Summary Judgment, Doc. No. 22 and Bailey has replied. (Doc. No. 25).

For the reasons stated below, the Court finds that Bailey is not entitled to qualified immunity.

## II. Background

### A. "The Shooting" [3]

Defendant Bailey is a thirty year old police officer with a little over two years of experience on the force with the Akron Police Department. Plaintiff Sample is a twenty-eight year old felon with an extensive arrest record. The two parties crossed paths on January 15, 2003, at B & G Designs International (hereafter "B & G" or "the building"), a commercial business located on the south side of Akron, Ohio. *See* Item Nos. 1 and 2. Around 9:20PM on that date, an alarm company alerted the Akron Police Department dispatch center that a second floor, rear motion detector had been activated at B & G. This information was transmitted to Bailey and his partner for the evening, Shawn Prexta. The officers were dispatched to respond to the alarm.

Bailey and Prexta parked their patrol car in front of B & G upon their arrival. They checked the front door, which was locked, and then proceeded to a dark alley in the rear of the building. Using a flashlight, Prexta noticed that a second story, rear window was broken and pointed this out to Bailey. Prexta also pointed out

footprints in the snow on top of a trash dumpster leading to the broken window. *See* Item Nos. 11 and 12. In the rear of B & G there was a wooden staircase leading to a door on the second floor with a small window. *See* Item No. 11. Bailey climbed the stairs and looked into the window. Looking through the window, Bailey saw a white male carrying what he thought was the operating unit of a computer. The white male Bailey saw was Sample. Bailey tapped on the window with his flashlight thinking that Sample may have rightfully belonged in the building. When Sample noticed Bailey he "turned around and took off" in the other direction at a brisk pace. (Bailey Dep. at 72, ll. 21.) It was then that Bailey realized Sample was a burglar.

After Sample ran, Bailey notified Prexta that a suspect was in the building. Prexta then called additional police units in order to form a perimeter around B & G. Prexta returned to the front of the building and found that Akron Police Officer Mobley had arrived on the scene. While Mobley secured the front of the building Prexta returned to the rear of the building with Bailey. Around the same time, the keyholder for B & G, William Huber, arrived on the scene. Huber told Bailey that no one was supposed to be in the building. In the same time frame, Police Sergeant Christopher Brewer arrived on the scene and took over control.

Huber opened the rear entrance on the first floor of the building and Bailey and Prexta went into the building to secure the immediate area. Once the area was secure, Huber was allowed to go into the building to deactivate the alarm which was blaring. Then, following Brewer's orders,

---

**3.** Color photographs of B & G International, the room where Sample was shot and the cabinet Sample was hiding in are provided as attachments to Bailey's Affidavit, Doc. No. 19. The photographs are identified in the docu-

ment by "Item" numbers. The Court will cite to photographs throughout the background section of this Opinion by Item number where it believes a visual representation of the scene will be helpful to a reviewing Court.

Bailey and Prexta began to search the building, remaining in arms-length of each other as they were trained to do in searches. Additionally, both officers had their drawn firearms in one hand and a flashlight in the other. There were no interior lights in the building and Bailey and Prexta had to use flashlights to find their way. As the officers walked through the building, Prexta repeatedly announced "Akron police, show yourself." (Prexta Aff. ¶ 5.) After securing the entire first floor, the officers ascended to the second floor of B & G. Upon reaching the second floor, the officers noticed a large, dark room. The room was cluttered with large, heavy duty machines and other equipment. The officers announced themselves again.

As the officers went into the dark room they noticed a long table with a large white sign leaning against it. *See* Item Nos. 16, 17 and 18. Not knowing what was behind the table, Bailey slowly walked down one side of the table and Prexta walked down the other. As Bailey walked by a black cabinet with black shelving above it, he smelled a foul odor. Prexta smelled the odor as well. Recalling a prior experience, Bailey thought that Sample may have been hiding in the cabinet. The cabinet was approximately five (5) feet wide, two (2) feet deep and two and a half (2½) feet high. *See* Item Nos. 19 and 20. Without informing his partner, Bailey unilaterally decided to open the cabinet door, which opened from the middle.[4] Bailey opened the door from the side of the cabinet with his left hand. Bailey held his flashlight in the same hand and his gun in his right hand. Bailey was careful to open the cabinet from the side so as not to stand directly in front of the cabinet.

When the door opened, Sample[5] was revealed hiding inside the cabinet. According to Bailey, Sample was packed tightly inside the cabinet with his back against the left side interior wall, his legs curled in a fetal possession and his hands in front of his body. When Bailey saw Sample curled in the cabinet, he directed his firearm and his flashlight at Sample and commanded, "[s]how me your hands[,]" Bailey Dep. at 84, ll. 19, "come out of the cabinet . . .[,]" *Id.* at 84, ll. 21 and "[m]ake sure I can see your hands the whole time." *Id.* at 87, ll. 20–21. Sample did not immediately respond. While Bailey was yelling commands, Prexta approached the cabinet and crouched down on his knees approximately two (2) feet away from the cabinet. He also holstered his firearm because "Bailey was [his] cover." (Prexta Aff. ¶ 10.) Prexta reached into the cabinet and grabbed Sample's left hand or wrist area with his left hand. Prexta testified that as he reached to grab Sample's left hand with his right hand, Sample pulled away from his grip and rolled attempting to pull his left arm underneath his body. Bailey was aware that Prexta was somewhere to the right side of the cabinet, however, he could not see his partner and did not realize that Prexta had holstered his weapon or that he had grabbed Sample's left hand. Bailey testified that from his vantage point, what he saw was Sample roll his body and move his right hand towards his torso. Then, Bailey yelled "show me your hands" several times. (Bailey Dep. at 89, ll. 11.) According to Bailey, Sample did not follow his commands, but instead, reached inside his jacket[6] with his right hand. "At that point, [Bailey] feared for his life" and un-

---

4. Prexta testified that he did not see Bailey open the cabinet.

5. According to police records, Sample is six feet and one inch in height (6'1″) and one hundred and seventy pounds (170lbs).

6. On the night of the shooting Sample was

consciously began to fire his weapon. *Id.* at 90, ll. 3. As Bailey began to fire, Prexta retreated out of the room to the top of the stair case.

It was later determined that Bailey fired his weapon seven times. But while he was firing, Bailey claims that he did not realize the number of times he had fired his weapon. As he fired his weapon, Bailey moved away from the cabinet down the side of table. He did not stop firing until Sample and the cabinet were out of his sight line. Bailey turned off his flashlight after he stopped firing. He testified that as he was firing he thought that Sample was returning fire possibly because of the sounds echoing off the walls of the room. During the shooting, Bailey did not know exactly where Prexta was located.

Bailey gathered himself after he stopped firing his weapon, turned his flashlight back on and rounded the other side of the table to check on his partner and Sample. As he shone his flashlight, Bailey could see that Sample was still in the cabinet. Bailey testified that at that point Sample looked at him and said "I don't even have a gun." (Bailey Dep. at 106, ll. 4.) Bailey began to see blood as Sample fell partially out of the cabinet onto the floor.[7] Bailey testified he continually asked Sample why he reached into his jacket to which Sample continually replied "I just wanted a cigarette." *Id.* at 106, ll. 19–20. Prexta, who had returned to the room after Bailey stopped firing also testified to hearing Sample say that he was reaching in his jacket for cigarettes. Bailey testified that Sample continued to reach into his jacket even as he laid wounded on the floor. Bailey still had his firearm drawn on Sample and he continually knocked Sample's hands away from his jacket.

Brewer heard Sample and Prexta yelling verbal commands and he saw light from their flashlights as they maneuvered through B & G. After hearing the shots, he ran up the stairs to the second floor room where he observed Sample being held at gunpoint. Brewer testified that Sample refused to listen to commands to keep his hands out of his jacket. Brewer finally pulled Sample from the cabinet but Sample was never searched by the officers because he was covered in blood. He was finally searched by a firefighter/paramedic, Mike Fagan. According to Fagan, as he treated Sample, Sample attempted to "place his hand inside the front portion of his jacket." (Fagan Aff. ¶ 3.) Fagan determined that Sample did not have anything inside his jacket. Fagan was the only paramedic that could treat Sample because there was so little room between the table and the cabinet. Fagan testified that Sample "said something about getting cigarettes from his jacket" on the way to the hospital. *Id.* ¶ 9.

**B. Sample's version**

Sample testified that he went to B & G to help a friend, John, retrieve a set of keys that had been thrown into the building by John's girlfriend. Before Sample ended up at B & G, he testified to only having two and a half beers. Nevertheless, his blood serum alcohol level after the shooting was .185%, almost twice the legal limit for driving in Ohio. *See* Ohio Rev. Code Ann. § 4511.19(A)(1)(c) (Anderson 2004) (0.096%). Sampled testified that both John and his girlfriend were at B & G with him.[8] According to Sample, both he

---

7. Bailey's testimony suggests that Sample's legs were still in the cabinet and just his torso was on the floor.

dressed in all black. The jacket Sample wore was a black, velour zippered jacket with outside and inside pockets on the left side and possibly on the right side.

8. Brewer testified that when he encountered Sample in the second floor room, he "kept

and John went into the building to find the keys. Sample testified that while looking for the keys, he noticed one officer outside shining his flashlight. He then ran and hid in the cabinet.

Sample remembers that as the cabinet door opened he saw two officers standing in front of him. He testified to hearing the officers command him at least twice to "come out with [your] hands up." (Sample Dep. at 64, ll. 10.) Sample testified that at that point he began to remove himself from the cabinet. Sample's testimony about his body position in the cabinet before the shooting is confusing. It appears from his testimony that as he attempted to remove himself from the cabinet, his legs were outside of the cabinet but his torso was partially in the cabinet. According to Sample, he grabbed the top outer shelf of the cabinet with his right hand in an attempt to pull the rest of his body out of the cabinet. Sample testified that this is when Bailey began to fire his weapon.

Sample's recollections of the events after the shooting are sketchy. He testifies to remembering officers saying that he had been shot. He also remembers what he described as an "older" officer encouraging him to "hang in there" as he laid on the floor. (Sample Dep. At 71, ll. 4–5.) He does not remember having any other conversations with officers or paramedics. He testified that the first conversation he truly remembers having after the shooting is with the doctor at the hospital concerning his injuries. On February 4, 2003, Sample pled guilty to Breaking and Entering and Possessing Criminal Tools in relation to the incident at issue.

After the shooting, Akron Police Officer Bill Laughlin went to the hospital to speak with Sample about the incident. Laughlin testified that Sample admitted to him that he was grabbing for cigarettes when he

was shot. Laughlin's Investigation Report quotes Samples as making the following statement: "I'm going to sue, man. He (policeman) shot me and I was just grabbing for my cigarettes. The guy didn't tell me not to stop or nothing." (Laughlin Aff. at 3.) Laughlin also testified that Sample told him that he was at B & G to help John retrieve his keys.

### III. Legal Standard

■■■ Whether a government official is entitled to qualified immunity is a question of law. *See Chappel v. Montgomery County Fire Prot. Dist. No. 1*, 131 F.3d 564, 573 (6th Cir.1997) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)). "However, where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir.2000) (quotation and ellipses omitted). "The purpose of a qualified immunity defense is not only protection from civil damages but protection from the rigors of litigation itself, including the potential disruptiveness of discovery." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir.2004)(citing *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Harlow v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir.2004) ("In actions involving the alleged abuse of government power, the defense of qualified immunity accommodates the tension between permitting litigants to recover damages . . ." and the social costs of such suits, including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able

referring to someone named John . . ."

(Brewer Aff. ¶ 8.)

citizens from acceptance of public office.") (internal quotations and citation omitted).

■■■ The qualified immunity doctrine provides "that governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. In *Champion,* a recent Sixth Circuit decision, the court set out the following three-step inquiry for determining whether qualified immunity is proper:

First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

at 900 (quoting *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003)). "If the answer to all three questions is 'yes,' qualified immunity is not proper." *Id.*

■■■ A court's consideration of a government official's motion for summary judgment based on qualified immunity is somewhat unique. Even though the defendant is the movant, once she raises the defense of qualified immunity, the plaintiff bears the burden of establishing the first two prongs of the three-step inquiry set forth above, *i.e.* constitutional violation and violation of a clearly established constitutional right. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Once a plaintiff establishes these elements, the defendant bears the traditional burden of showing that "no genuine issues of material fact remain that would defeat [her] claim of qualified immunity..." *Hoard v. Sizemore,* 198 F.3d 205, 211 (6th Cir.1999).

Against that backdrop, the Court will address Bailey's qualified immunity defense.

## IV. Jurisdiction

Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Sample brought his unreasonable force claim pursuant to the United States Constitution and 42 U.S.C. § 1983. Additionally, venue is proper under 28 U.S.C. § 1391(b).

## V. Analysis

### A. The Occurrence of a Constitutional Violation

■■■ The Court must first consider whether the facts, when viewed in the light most favorable to Sample, demonstrate the occurrence of a constitutional violation. *See Champion,* at 900 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). To examine this "threshold question," the Court must first set forth the legal principles which " 'will become the basis for a holding that a right is clearly established.' " *Id.* at 901. In *Champion,* the court stated:

[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard. The test's proper application requires careful attention to the facts and circumstances of each particu-

lar case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 901. Here, to take the facts in a light most favorable to Sample, the Court would have to assume that Bailey shot Sample, an admitted burglar, after Sample reached to grab the top of the cabinet that he was hiding in with his right hand in an attempt to pull himself out of the cabinet. Taking these facts as true, Sample posed no threat to Bailey at the time Bailey shot. Therefore, the use of deadly force was not objectively reasonable.

### B. A "Clearly Established" Right?

▮▮▮ To overcome the bar of qualified immunity, a plaintiff must show that a right was clearly established in the law at the time the alleged violation occurred. " 'In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.' " *Champion,* at 902 (quoting *Higgason v. Stephens,* 288 F.3d 868, 876 (6th Cir.2002)); *Whitlow v. City of Louisville,* 39 Fed.Appx. 297, 303–04, 2002 WL 1455317, at *6 (6th Cir.2002) ("The Supreme Court instructed that courts should examine the totality of the circumstances in determining whether a particular type of force used was reasonable.") In addition, courts may look to the officer's training to demonstrate such a clearly established right. *Id.* at 902 (relying on the defendant police officers' training in finding that the plaintiff had demonstrated that the officers were aware of his

clearly established right to be free from excessive force.) [9]

▮▮▮ Case law and Bailey's training on the use of force demonstrate that at the time of Sample's shooting, there was a clearly established constitutional right for a suspect to be free from deadly force except where the suspect poses an imminent or immediate threat either to officers or others. One of the first articulations of this right came in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Under *Garner,* the police may not use deadly force against a citizen unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3, 105 S.Ct. 1694. This same standard has been repeatedly followed by the Sixth Circuit in deadly force cases. *Whitlow,* 39 Fed.Appx. 297, 302–03, 2002 WL 1455317, at *5 (recognizing that deadly force is only justified where a suspect poses an immediate threat); *Sova v. City of Mt. Pleasant,* 142 F.3d 898 (6th Cir.1998) (citing *Garner* ); *Adams v. Metiva,* 31 F.3d 375, 386–87 (6th Cir.1994)(stating that "both the right to be free from unreasonable seizures, ... and to be free from the use of excessive force under the Fourth Amendment, ... are clearly established.") (internal citations omitted); *Dickerson,* 101 F.3d at 1162–63 (citing *Adams* ). In addition, Bailey was trained by the police department that deadly force is only necessary, *inter alia,* "in defense of any person in immediate danger of serious physical injury." (Akron Police Division Policies at 2, Doc. No. 24, Ex. 6.) Thus, the prohibition against deadly force for non-threatening suspects was a

---

**9.** Sample asserts that there is "clear and ample Supreme Court case law that predates the incident by several years" that establishes a prohibition against the type of excessive force alleged in this case. (Pl.'s Br. Opp'n at 9.) Yet, Sample does not articulate any such precedent.

clearly established right that existed at the time Sample was shot.

## C. Sufficiency of Evidence

Lastly, the Court must determine " 'whether the plaintiff offered sufficient evidence to indicate that what the [government] official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.' " *Champion*, at 905 (quoting *Feathers*, 319 F.3d at 848). "Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the [defendant] committed acts that allegedly violated clearly established rights." *Dickerson*, 101 F.3d at 1158. The Court finds that Sample has produced sufficient evidence to overcome summary judgment.

In *Sova*, the Sixth Circuit stressed "that summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." 142 F.3d at 903. The court explained its statement in the following quotation:

> When the legal question … is completely dependent upon which view of the facts is accepted by the jury, the District Court cannot grant a defendant police officer immunity from a deadly force claim. This is because the reasonableness of the use of force is the linchpin of the case. If the jury determines the officer shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally unreasonable under the Fourth Amendment. On the other hand, if the jury believes the officer's version of the facts and finds the officers conduct was reasonable, then he will be entitled to qualified immunity. Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability. This is

especially true considering that the District Court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment.

*Id* (internal quotations and citations omitted). Here, like *Sova*, the question of qualified immunity turns on which versions of the events are accepted, Bailey's version or Sample's version. It is undisputed that B & G was dark, Bailey was confined in a small space when confronted by Sample, Sample was intoxicated and Sample was a burglar. In addition, it is clear that Bailey was jittery being that he fired his weapon at point blank range and only hit Sample in his extremities. However, Sample claims that Bailey shot him after he reached his right hand out of the cabinet while Bailey claims that he shot Sample after Sample reached into his jacket. Whether Bailey's actions were reasonable is contingent on the fact-finder's resolution of that factual conflict.

## VI. Conclusion

For the foregoing reasons, Bailey's Motion for Summary Judgment based on qualified immunity is DENIED.

IT IS SO ORDERED.